Do you wish to reserve any time for rebuttal? Yes, Your Honor. Good morning. My name is Michael Sherwood. I would like to reserve five minutes for my rebuttal. All right. Thank you. Your Honor, this case presents two separate but related claims under the National Environmental Policy Act. First, that the Forest Service violated NEPA by failing to prepare an environmental impact statement on the Meadow Valley logging project in the Plumas National Forest. And secondly, that whether or not they prepared an environmental impact statement, they had an independent obligation under NEPA to evaluate the cumulative impacts of the Meadow Valley project with other similar logging projects implementing the Quincy Library Group Act pilot project and that are in the immediate geographic area of the Meadow Valley project. The claims are related because they had to do an EIS because of the cumulative impacts and other reasons and the existence of the cumulative impacts is a factor triggering the need for an environmental impact statement. The legal context, Your Honors, is that NEPA provides a very low threshold for preparation of an environmental impact statement. As Judge Fletcher said in a 1998 case, Blue Mountains Biodiversity Project v. Blackwood, which is a case, by the way, that has facts very similar to this case and is dispositive of many of the issues in this case, an EIS must be prepared if significant questions are raised as to whether there may be significant impacts and the plaintiffs in an NEPA case do not have the burden to show that significant impacts will in fact occur, only that they may occur. That was the law then in 1998 and it's been consistently reaffirmed by this court, most recently in Ocean Advocates v. Army Corps of Engineers just this year. So given that very low threshold, this project, the Meadow Valley project, just on its face is a major federal action significantly affecting the quality of the human environment. This is a big project, Your Honors. It involves logging of 6,400 acres of timberland. That's 10 square miles, about six times the area of the Golden Gate National Park here in San Francisco. It involves removing 40 million board feet of timber over a period of five years using 10,000 logging trips. And as I'll discuss in a moment, it also has significant impacts on the California Spotted Owl and on public health and safety. But before I get into any further detail about the need for an EIS in this case, I'd like to spend a minute or two talking about the case that this court decided a couple of weeks ago and that the government submitted to the court just last week as a supplemental authority. And that's the case of the Native Ecosystems Council versus Forest Service. Although the court in that case reached a different conclusion from what we're asking the court to do in this case, the facts in that case are very different from the facts in this case. First, the area to be logged in that case was relatively small, about 720 acres as I recall, compared to 6,400 acres in this case. Secondly, the claim in that case was that the logging would harm a single nest of a single pair of northern goshawks, which is a species that, as this court in Native Ecosystems Council pointedly noted in a footnote, footnote four I believe, is not imperiled. It's not in decline. And the Fish and Wildlife Service had determined that the goshawk did not need to be listed as a threatened or endangered species under the endangered species law. And neither is the spotted owl a threatened or endangered species, correct? Yes. It is not yet, Your Honor. That's true. But it is in decline. There's no question about that. And the U.S. Fish and Wildlife Service just recently in June did find that listing the California spotted owl as a threatened or endangered species may be warranted. That Federal Register notice is not in the record because it came out after the decision below, but we have attached it as an appendix to our opening brief, appendix four. The logging in Native Ecosystems Council did not include any old-growth forest, which is the northern goshawk's primary habitat. Did not include what? Old-growth forest. Old-growth, yes. Okay. And the court in that case specifically noted that. All right. The logging in this case, by contrast, will affect some over 4,000 acres of suitable spotted owl habitat and will render all of those acres unsuitable. It also will render unsuitable 1,000 acres of habitat that the California spotted owls actually use as their so-called home range core areas. Now, there's some provisions in here about the diameter of the trees. Is the diameter of any of the trees would qualify them as old-growth in this case? There are, Your Honor, yes. But there is. . . There's 24 inches or I forget and then more. And, yes, the Meadow Valley Project allows logging of trees up to 30 inches in size, which is very big and usually a very old tree. And, in fact, if necessary for reasons of, quote, operability, which means moving the heavy equipment around, they can cut trees even bigger than that. There are no limits for removing trees for purposes of operability. And, finally, just a final point of distinction in the Native Ecosystems Council case. In that case, the Forest Service apparently did adequately evaluate cumulative impacts. The Court noted that the Forest Service offered, to quote, an extensive analysis of the cumulative impacts. There was a, quote, articulate and careful cumulative effects analysis. It was, quote, detailed and quantitative. Again, by sharp contrast, in this case, Your Honor, with respect to past and present projects, other logging projects, the Forest Service at best simply listed those projects in the environmental documents, gave the number of acres to be logged and the logging method to be used, but did not at all engage in any kind of an analysis of the cumulative, incremental, synergistic effects of the impacts of those projects with each other or with the Meadow Valley Project. Well, but didn't they take the analysis area and measure from the nests to the HRCA and to the SOHA and say that beyond that, there would be no necessity to provide foraging for the birds and, therefore, the cumulative projects would not have any impact? I mean, the other projects wouldn't have any cumulative impact. Wasn't there some expert testimony that said that the projects that you consider to have a cumulative impact would not have a cumulative impact? Wasn't that the position of the Forest Service? That was their position. And that position wasn't taken on a basis of conclusions or speculations, but based on the experts that they chose to believe as opposed to your experts that they chose not to believe. Isn't that it? Well, Your Honor, if ---- I mean, isn't it just a choice of evidence before the administrative agency? No, it's more than that, Your Honor. Address, would you please, the specific evidentiary failings which you claim the Forest Service experts were guilty of. Yes, I'd be happy to, Your Honor. There's a map in the administrative record that is quite pertinent to this discussion, and it appears at our excerpts of record item number 14, which is the biological assessment, biological evaluation. And it's ---- What's the page record? The record page number is 04489, and it's towards the end of ---- In fact, it's the last page of that. Biovalley, DFPZGS, Project Spotted Alpax, and HRCA. Okay. That stands for Defensible Fuel Profile Zones. Now, just a minute. Which tab is that in your excerpt of record? Tab 14, Your Honor. Tab 14? 14. And it's the last page of that. The excerpt contained in that tab. The last page of it, just before you get to tab 15. Right. And this map shows the dark line is the boundary line of the project and of the wildlife analysis area. And the numbers that say the PL-117, PL-251, et cetera, those are owl nests. Right. The PL stands for Plumas National Forest. And you'll see, Your Honor, although there are lots of owl nests within the analysis area and home range core areas, there are also plenty of owl nests right outside the boundary area. By my count, there's 12 or 13. So while the Forest Service says that they based the analysis area on the distribution of spotted owls, in fact, there are spotted owls outside the analysis area, as is evident from this map. As I understood the government's position, the government, the Forest Service position, is that when one did a mapping from the owl sites using the mile and a half radius to the SOHA, the spotted owl habitat area, that the outermost ring, which starts with the nesting ring and then goes to the home range core area and then goes to the spotted owl habitat area, that mile and a half radius includes an area from each of the PLs, the nests, and gives each of those nests sufficient area. Is that so? Well, again, that's what they – but that's not the case. That would be lied by – first of all – So therefore, their evidence is faulty, and now I'm going to ask you why it is faulty. Because, first of all, they don't – SOHAs, spotted owl habitat areas, are no longer used. That was the designation. That designation has not been used by the Forest Service since 1992, I believe. They do use the PAC, the Protected Activity Center, which is a 300-acre circle, if you draw it schematically, around the nest site. Are any of these – first of all, is it your position that the PAC is a 300-acre area? Any of them are misrepresented on the map? No. So they each have 300 acres around the nesting area of each of these spotted owl nests, right? That's right. And there's not going to be any logging activity that goes in there. That's correct. Then you go to the next 700 acres. The next layer, the next circle, as we'll call it, is the home range core area, not SOHA. Right, and the home range core area – The home range core area in the Plumas National Forest is about 1,000 acres around each nest site. Okay, that's the 300 and the 700. And those are shown – And there's going to be no logging in that 1,000-acre area? There will be. There will be 1,000 acres of home range core areas logged by this project. Now, there's another – In the HRCA, not in the 300. That's correct. Okay, fine. So it's in the foraging area, not in the nesting area. Well, they overlap somewhat. But there's another circle, Your Honor, of the home range. And the Forest Service completely failed, ignored the existence of the home range. The home range core area is about 20% of the larger home range. The core area is where they conduct about 60% of their owl business. But there's a larger home range that's about 5,000 acres in the Plumas National Forest, which they did not consider in drawing their wildlife analysis area. The home range extends way beyond the boundaries of the wildlife analysis area and would extend – could extend into adjacent neighboring projects, such as the Basin Project, which is immediately adjacent to the southwest. Let me try to understand you. Yes. You're saying that there's a home range area which is larger than the home range core area. That's exactly right. And that the government experts gave faulty evidence because they did not consider the home range area. That's correct. And only considered the home range core area. Right. All right, I've got you. Exactly. And there's another map, Your Honor. There's just two maps that I want to draw your attention to. This is one. The other important map appears at tab 33 of our expert – our excerpts. And before we get to that, and the reason that it's faulty evidence is because you can't really consider the impact upon the spotted owl unless the home range area as well as a home range core area is considered. Right. Okay. Exactly. The other map, Your Honor, appears at page – I mean, the excerpts of record 33, Meadow Valley Project and adjacent projects. This is a map that was prepared by the Forest Service itself, submitted to the court below. And that shows four or five other projects. These are future planned projects in the immediate geographic area of the Meadow Valley Project. These were all in the pipeline, and some of them had been approved at the time the Forest Service approved the Meadow Valley Project. And you'll see in each one of these little squares is a mile, I believe, on this map. You'll see the Basin Project is contiguous to the Meadow Valley Project to the southeast. The Empire Project is contiguous to it to the northeast. And there are other projects nearby. And in those projects, similar DFPCs and selection groups, half an acre to two acres, will be taking place. But on the other hand, if the experts adequately took into consideration the area needed by each of the spotted isle nests in the subject project, Meadow Valley Project, it would be irrelevant that other projects were taking place, wouldn't it? No, it would not be, because if you look at this map, you can see that the home ranges of the Meadow Valley owls may extend into the Empire Project, may extend into the Basin Project. So the big issue here is whether the experts were correct in limiting their scope of review to home range core areas, or should they have taken into consideration home ranges? Well, that's an issue. They never explained why they didn't consider home ranges at all. But your position is it's not enough not to. They should have taken into consideration home range areas. Yes, absolutely. And their opinion is infirm as a result of their not doing so. Absolutely, yes. And so these projects are all Quincy Library Group projects. The purpose of them, among other things, was to create this network of DFPZs, half-mile long clearings, throughout the Plumas and Lassen National Forests. I'm not so sure my questioning used up most of your time, but your time is up. But we will give you your five minutes of rebuttal. You get it. Thank you. Thank you. May it please the Court, I'm Lisa Jones from the Department of Justice for the United States Forest Service. I feel I should probably give a little bit of context and then turn directly to the issue that seems most important to the Court. This case is somewhat unusual from the normal Forest Service management cases that this Court hears because the Meadow Valley project is part of a pilot project that Congress directed that the Forest Service implement within the Herger-Feinstein-Quincy Library Group Act. This act was based on locally developed consensus regarding how to best manage the forest, number one, to get the forest health better. The forest health in the Sierra Nevada range is in a difficult situation, much like the situation this Court addressed in the Native Ecosystems Council, the 28-day letter that we sent in. From a century of harvest activities, the stands that have been regenerated after that time are less fire resilient. There's a large fuel load on the forest, and there's just a problem with forest health and a real risk, both to owls and also to the local communities of a stand-replacing fire, a catastrophic type of fire. So the local communities, environmental groups, and timber organizations got together to discuss how best to approach this situation and took a proposal to Congress, and Congress said, try it, study it. Congress acknowledged that this is an unusual way to manage forests and that it doesn't want to do that all the time, but it wants to see if these types of silvicultural treatments can actually make a big difference in this area. So it said, give us a limited geographic scope, give us a limited time frame, give us a lot of monitoring and an ability to adapt your management if you see some problems occurring. We want to see what's going to happen, and that's the context within which the Meadow Valley Project arises. You know, Counsel, it surprises me that because of the large area and the uniqueness that an EIS wasn't just automatic. Well, Your Honor, another part of the context that I was going to address is the extensive programmatic analysis that's already been done at the scale which the plaintiffs have asked for. Congress said, prepare an EIS on the entirety of the Herger Feinstein and Quincy Library Group Act, and the Forest Service did just that, a programmatic EIS looking at the entire scope of the project, what potential impacts on the owl there could be, and the benefits of this project to the local communities and to the forest health generally. The Forest Service did that at a programmatic level. The Forest Service did two other programmatic EISs addressing specifically uncertainties to owls, the status of the owl, how best to manage within these forests to preserve habitat components that are important to the owl, and then again in 2004, the Forest Service did another programmatic analysis looking again at the Quincy Library Group Act, implementing that act, what the impacts of implementing the act would be, and that leads to the ability for the Forest Service to prepare an environmental assessment relying on all of that extensive programmatic analysis and relying on extensive site-specific analysis. Let me ask, what additional would you have done if you did an EIS? That's very difficult to answer, but here you had an EA that was, there was a scoping process before the EA was prepared. There was, first of all, it's a consensus-based proposal, so you have the local communities are very behind it, and you had an EA that was scoped. Comments were considered. Comments were addressed. I mean, there is, NEPA sets up, there is a difference between an EA and an EIS from a public information perspective, but this court has recognized that you look at the substance of NEPA. NEPA itself, the NEPA's implementing regulations are replete with, don't redo the analysis. Look at the bigger analysis that you have. Focus on the impacts that are significant to the project before you, and you can do that with an EA. And here, the EA was very comprehensive. The EA took a very hard look at the OWL. It has a specific biological assessment, biological evaluation, that looks at the cumulative impacts on the OWL, and I wholly disagree with the characterization of the cumulative effects of this project that my opponent brought to the court this morning in his brief. This is nothing like the cases where this court found that there was no analysis or there was only a list. There is true analysis here, and I'm going to turn directly to the point that we left off with my opponent on, which is how did the Forest Service define its analysis area for the Meadow Valley project? And this is not an arbitrarily based analysis area. This is an analysis area that the Forest Service wildlife biologists determined would, in fact, encompass all potential cumulative effects on the OWLs. It didn't just draw it along the home range core areas that would be impacted by the project. It went beyond that to the next home range core area, and it did that based upon OWL behavior and the potential for there perhaps to be competition between OWLs in one area and in another area. And the statement by my opponent that there was no effort by the Forest Service to look at the actual home range of the spotted owl is absolutely wrong. As we explained in our brief at page 31 and as the record demonstrates, the Forest Service formulaically modeled how it would expect spotted OWLs to range from this PAC area. And the way that it's explained here, the home range core area itself, this 1,000-acre on the Plumas National Forest circle, you have the 300-acre protected activity center, then you have another circle of 700 more acres for a total of 1,000. Those are equal to 20% of the sum of the average breeding pair home range plus one standard of error. And Forest Service wildlife biologists determined that that is an appropriate measure of actual ranging activities for the spotted owl. This is very similar to what this court addressed in the Selkirk case, where the court looked at whether the agency could have limited its analysis area to a bear management unit that was supposed to approximate. And this court said, you don't have to know exactly where the mother bear is going to wander. You have to approximate that basic home range, and that's exactly what the Forest Service did. They modeled it. This is scientific modeling, and the choice of that line around the project is scientifically based on the geographic range of the owl. But based on what you've told me, if my notes are correct, the PAC and the HRCA are 20% of the actual range of the bird? The HRCA, which encompasses the PAC, is 20% of the sum of the average breeding pair. So it's kind of a mean plus one standard of error. So it's larger than 20%. Plus one standard deviation error. Yes. So are you admitting that 80% of the possible range of the bird is not analyzed? No, no. It's just that that's... What the Forest Service did to approximate how a typical breeding pair might forage from its nest area, it was looking at, you know, you might have one group that would go further, one group that wouldn't go as far. So the Forest Service determined that for an HRCA, to determine how many acres you should have within that home range core area, that's the average breeding home pair plus one standard of error. For the wildlife analysis boundary in the Meadow Valley project, the Forest Service went beyond that 20%, looked to the next HRCA beyond. Why 20%? And where did this 20% come from? This is just based on statistical modeling from the information that Forest Service biologists are studying. And it's 20% of what? Usually a percentage is of something of something. 20% of the sum of the average breeding pair home range. So it's based upon studies of owls and how far they might range. It sounds like you're only then analyzing one-fifth of the area where they range. No, this is how the Forest Service has determined best to look at where, and this is also how the programmatic analysis, which my opponents don't challenge, for the home range core areas, that's how they were established. Everybody seems to think this is just grand, but just like my colleague here mentioned, it sounds like you're just looking at 20% of the areas. Well, it's not just looking at 20% of the area, particularly for this analysis area, because that goes beyond the first home range core area. It goes much further than that. And also you have to look at the way that the Forest Service looked at analyzing the impacts here was you do have 6,400 acres of project treatments. And what the Forest Service wanted to look at is within this 85,919 acre analysis area, what is going to really happen? What components of spotted owl habitat are going to be impacted, if any? And how do we implement Congress's will in the Herger Feinstein Quincy Library Group Act and make sure that in the short term we don't impact spotted owl habitat? Because it is undisputed that in the long term, spotted owl habitat will be protected better after this project, because these fuel treatments will take the forest to a more fire-resilient stage and give you larger diameter trees that are going to be able to provide better habitat for the spotted owl in the long term, looking 20 years, 50 years, 130 years ahead. There are some long-range aspects to this project, very similar to what this court looked at in Native Ecosystems Council. All right, Ms. Jones, let me ask you this. We've been talking about the nest area and 300 acres around the nest area. And then we talked about the home range core area, which is the next 700 acres in concentric circles, if you will. Okay. And then you're saying that the Forest Service looked at an additional home range core area of how much? The home range core areas in the plumas are predominantly 700 acres, but some of them are greater than 700 acres, but approximately 700. And then they drew their line, the 85,000 acres in which they were going to make their study. Yes. Is that correct? Yes. According to this formula? Yes. Now, then I look at the map, which is Mr. Sherwood said it was at 30. Yes, the top one in the last page. No, that doesn't really do it. It's the one that was 13 or something like that. I've got it in your, the government's supplemental excerpt at page 704. It's the same map. It's the last page of item 14. Of item 20 in yours? Item 14. 14. Well, I've got that one. That's not the one I was concerned about. The one that I'm concerned about is the second one you mentioned, Mr. The other one is item 33. Yeah, there it is underneath the declaration. Yeah, that's the same thing as the government's excerpt of record 704. It's the same map. Okay? Yes, I do. Thank you. Now, when you apply these elements to your formula as to what the area is the Forest Your area works around the basin project area. Now, how come, and then it just barely, it doesn't touch but meets the Empire Project area. How come that happens? If you're just, if you're following this, it didn't seem that would happen. Well, when it says the project area, this, again, this map is showing a shaded area. That's the analysis area of the basin project that abuts the analysis area for the Meta Valley Project. So it's not a treatment on top of a treatment. I see. And likewise, for the basin project, there would be an analysis that goes beyond, you know, what those owls need within that area. So it's very much like the cases that this court has seen, Inland Empire, Selkirk, where the agency was found to have discretion and exercise it appropriately to choose the relevant geographic range for the species. Let me ask you, why didn't you consider that part of the Danish project area? It seems rather obvious by drawing the lines the way they're drawn that it was drawn. Of course, the basin project area, again, it was pulled back, wasn't it, one day? The Forest Service made a good faith determination at the time it was planning for Meadow Valley that there was no overlap with the project units. When it found that there was some, it pulled those units. But the reason why it was okay for the Forest Service not to do a larger analysis that would have incorporated the basin or empire or the other projects was, number one, because it did take a scientifically based cumulative effects analysis area, which was appropriate for the spotted owl and to look at the cumulative impacts on the owl, the potential cumulative impacts from those treatments. This was also in light of the fact that it had before it evidence, both in 1999, Quincy Library Group, Programmatic EIS, the 2004 Programmatic EIS that said, here's what would happen if we did implement all of the pilot project units. And so all of this is done in light of the knowledge of the impacts on the owl from full implementation of the Act. So it was looking at what's significant here, and it chose the analysis area that would encompass the impacts on the owl, and that's appropriate. And because those projects fell outside, the Forest Service didn't need to analyze them. What's also important here is that perhaps if the plaintiffs had brought these particular projects, if these were important to them during the administrative process, and they had brought them to the Forest Service and said, hey, look, we want you to do some more on this, they would have given the agency the opportunity to do that. But if you look at the comments submitted by the plaintiffs in this case, they were asking for not please look at part of the basin project or all of the basin project or part of empire or all of empire. They didn't even mention those. Their comments, and I'll either quote the cumulative impacts regulations or what's very telling, and this is what they also stated to the district court during the hearing in this case. At 621 of our excerpts, they defined the foreseeable future projects for the cumulative impacts analysis as the total QLG, Quincy Library Group Act, pilot project logging. Well, that's already taken care of in the programmatic analysis. And then at page 622, they describe what they believe is the appropriate scale for cumulative impacts analysis, and they quote, I'm quoting them, they say it should be the entire Sierra Nevada. Well, that's 11.5 million acres of forest, and that was analyzed at the programmatic level as it should have been. And they also then say on that same page that they would like all projects in the Sierra Nevada to be considered. Well, when the Forest Service is faced with comments that are saying, hey, redo your programmatic analysis, they weren't even given the opportunity to try to present more discussion in the record regarding their effects analysis. This is very similar to the argument that the plaintiffs were making in Inland Empire. They're like, hey, you've got to look everywhere. And this court said, no, you can look at the watershed. You had a 12,000-acre project, a 28,000-acre watershed, and this court said that was fine because it was biologically sound. And that's the same issue here. If they had wanted more, they should have asked for more, and perhaps the Forest Service might have adjusted it. But that doesn't mean that the way the Forest Service chose to prepare the analysis area and to conduct its analysis, that doesn't mean that was faulty. It was quite appropriate, particularly under this court's case law. And I suppose you might argue that even if I thought maybe they should have gone a little farther with the area they studied, our test is whether they are arbitrary or capricious in determining what they did as to the area they studied. Exactly. And here they're ---- Ms. Jones, with respect to 704, as I see it, the shaded areas inside the analysis areas indicates where the work is going to be done, right? Well, the ---- as I understand it, and if I'm incorrect ---- It's the projects, right? It says the project area, but that, as I understand it, it's the analysis area boundary for these projects that abut the analysis area boundary. It seems to me that as one approaches the lines of the Basin Project area and the Empire Project area, it seems to be at least one square mile of distance between the Meadow Valley Project and the Basin Project site area. Is that significant? The fact that there's one square mile? Well, it's only significant in the context of how the Forest Service biologists looked at the protected activity centers and home range core areas. I mean, it was ---- I mean, the Forest Service, without worrying about what projects were occurring here and there, because they knew approximately, you know, how much acreage might be impacted based under the entire act, when they were developing the Meadow Valley Project, said, we're going to look at what will impact the OWL, where might they move if there's competition, if the group selections take away a little bit of the foraging habitat and the prey species go to the edges, will that cause one breeding pair perhaps to move, encroach on another breeding pair's area and cause competition between the two, which might lead to a less productive breeding pair? And in determining where that competition might lead the breeding pairs of OWLs, it drew the area. In that area, there are 30 protected activity centers for OWLs. Only 16 of them are subject to treatment under the project. And the areas that are subject to the most treatment are areas where there hasn't been a breeding pair since 1992, and there hasn't been an OWL sighted in at least two years. And there's only one home range core area where there's even a moderate risk of impacting the viability to the spotted OWL. So the Forest Service looked at this project, the significance of this project, the potential significance of the group selections and defensible field profile zones and said, how might this make the OWLs move? And that's how they drew the boundary. It's also important to recognize that the Forest Service took into account one very important aspect, and I mentioned this before, but I'll mention it one more time, is one of the most damaging impacts to spotted OWL habitat could be a catastrophic fire. And the whole purpose behind this project was to try to stop that from happening in this area. And I am out of time. I wanted to ask you one question. Apparently, in executing the project, there are going to be some open spaces between foraging areas, and do we know how the OWLs will treat that? Well, if you go back to even the CASPO guidelines and all of the programmatic analyses along the way for the OWL, group selection, that's the treatment that would leave some openings, is considered to still provide a continuous forest cover. So it does take down. But it doesn't. In fact, it doesn't provide a continuous cover. Isn't that correct? Well, under the Forest Service definition of a continuous forest cover, it does provide that. And in fact, within the groups, the big hardwood trees are left, and large fire-resistant pines are left within those areas. And ultimately, there's regeneration in those areas of the species. Ultimately, yes. Right. But if you look at the records, particularly you're concerned with prey species, right? I mean, that's where we're going. If you look at the record, the record finds both at the 2004 programmatic level of modeling and also within the site-specific biological assessment and evaluation that, in fact, the wood rat, which is one prey species that owls prefer, they actually like to have an earlier successional forest, so they would be inhabiting the group areas earlier. And the squirrels might move to the outside of the areas. But ultimately, if you look again to the long-term benefits of the project, within 20 years, foraging habitat would increase for both of them. Yes. We haven't decreased them too much in the interim period. One other question. At some point when this was completed, you discovered that you didn't have the lines right, correct? Is that in one area? No, the lines were correct. What was discovered is that as the planning for the basin project went forward, there were units of basin that were within the analysis area for the Meadow Valley project. And at the time that the Meadow Valley project analysis was done, it was believed that there was no overlap. So those were dropped from the project, which is an appropriate thing to do. Thank you. Thank you very much, Ms. Jones. Mr. Sherwood, you have five minutes. Going back to cumulative impacts, Your Honor, I mentioned that the Forest Service did little more than list the past and present projects, which is not adequate under this Court's case law. With respect to the reasonably foreseeable future projects, which include those that are on the map in Item 33 of our excerpts of record, the basin project, the empire, the watt dog, slapjack, and so forth, the Forest Service completely dropped the ball. There was no mention of any of those projects in their environmental analysis. So they not only failed to take a hard look at the cumulative impacts of those projects, they took no look at all. The opposing counsel claims that their programmatic EIS took care of that. Yes, Your Honor, she did. But as Your Honor, Judge Fletcher said in the case that I referred to in my opening statement, Blue Mountains Biodiversity Project versus Blackwood, and just quote from that opinion, quote, nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS without regard to the nature or magnitude of a project. There's a more recent case, Klamath-Siskiyou Wildlife Lands Center, in which this Court made the same point, that tiering to a programmatic EIS cannot save an environmental assessment when the programmatic document does not have any site-specific information. And that's the case here. The programmatic EISs that counsel refers to are all just that, they're programmatic. They all specifically say that they do not evaluate site-specific impacts, and they leave that to later, to the later site-specific environmental documents. In the 1999 Quincy Library Group programmatic EIS, in fact, found that logging in suitable owl habitat by the Quincy Library Group Act pilot project, logging projects, posed a serious risk to the viability of the California spotted owl. The Meadow Valley project is the first of the Quincy Library Group projects that allows logging in suitable California spotted owl habitat. It poses a risk, and the environmental assessment acknowledges that risk. These projects are all interconnected, interrelated. They're all part of the Quincy Library Group Act pilot project. The Forest Service clearly, when it plans one of these projects, has in mind the other projects that it's already done and the future projects that it's going to do. And it's critical that the cumulative impacts of these projects be evaluated. Owls in Meadow Valley don't know that they're only supposed to be in the Meadow Valley analysis area. In fact, they fly in and out all the time. This is just a line on a map drawn by some Forest Service planner. It's not a fence in the forest. As we discussed earlier, the home ranges of the owl extend far beyond the boundaries of the analysis area. They may extend into the basin project area. They may extend into the empire project area. And so logging in those two projects, just as an example, may very well impact Meadow Valley spotted owl habitat. So that's why the cumulative impacts are important and need to be... On that point, Mr. Sherwood, I had some recollection that I read that the spotted owl doesn't travel too far from its nest. Isn't that sort of an attribute of the owl? Well, it can travel up to within the extent of... It can travel as far as it can fly, but I mean typically... It typically will travel within its home range, which is in the Plumas National Forest about 5,000 acres around the nest site. And again, that area extends way... You say they did not consider that only? They did not consider that. And those areas extend way beyond outside the boundary area of the Meadow Valley analysis. Your scientists would have considered that. Well, we did submit declarations, which the court below accepted, that addressed that issue. Yes, sir. And the government scientists did not consider that? They did not address it. They considered just a home range core area. That's right, Your Honor. Your Honor, Judge Fletcher, you asked, didn't they lay out units of the basin project area within the Meadow Valley project area? They did indeed. That came to light during the course of the proceedings below, and the Forest Service, with something of a red face, I imagine, had to admit they made a mistake. But that's evidence of how interrelated these projects are and also it's evidence that the Forest Service failed to take a hard look at the cumulative impacts of these. Thank you. You've used up your time. Thank you, Your Honor. Thank you, Mr. Chairman. Thank you, Mr. Chairman. Good arguments, counsel, from both of you. It's great to be congratulated. This matter will be submitted.
judges: B. Fletcher, Thompson, Bea